ON MOTION FOR REHEARING EN BANC
SHARP, Chief Justice.
We withdraw the prior opinion in this case and issue the following in its place.
Robbie Costlow appeals his conviction for concealing a child in violation of a court order, section 787.04(1), Florida Statutes (1985). Appellant argues there was insufficient evidence to prove the elements of the crime.[1] We affirm.
Section 787.04(1) provides:
It is unlawful for any person, in violation of a court order, to lead, take, entice, or remove a child beyond the limits of this state, or to conceal the location of a child, with personal knowledge of the order.
The trial court also instructed the jury as to the lesser included offense of interference with custody. § 787.03, Fla.Stat. (1985).[2] The jury returned a guilty verdict as to concealment. There was abundant evidence to support a conviction for concealment or interference.
The record establishes that Robbie (the appellant) and his girlfriend, Dawn, conceived a child when he was sixteen and she fifteen. They married. Shortly after the birth of their daughter, Julianne, they separated and later divorced.
There are three court orders referenced in the record. The first was an ex parte injunction issued March 19, 1986 which re-, quired Robbie and Dawn to refrain from contact with one another. Apparently this was prompted by a spouse-abuse incident (Robbie hit Dawn). It also provided Dawn would have temporary custody of Julianne; and that the order would only be effective for one year, or further order of the court.
After two full hearings, the custody of Julianne was settled. A temporary order issued on March 27, 1985. Its provisions were later adopted in full by an order dated September 5, 1985, after the final hearing.
In those custody orders, Robbie was given visitation from 10:00 a.m. to 4:00 p.m. one day a week and two hours one evening per week. Dawn was given primary custody. Robbie testified that he was aware of the provisions of those two orders, as were his parents, and he complied with them *1261 until June 18, 1986 (although he did not fully exercise his rights thereunder).
Robbie testified that he thought all of the orders were only effective for one year. But only the first order had any such time limitation. It is patently unreasonable to think custody orders are only valid for one year and that thereafter the whole custody dispute must be resolved anew. In any event, the jury was free to disbelieve Robbie’s testimony on this point, and they obviously did.
After the divorce, Dawn and Julianne moved to the residence of Dawn’s grandmother and step-grandfather in Cocoa Beach. Dawn’s mother also lived there. Dawn was working at two jobs and attending community college. Dawn’s mother worked during the day as a medical secretary. All three women shared the care and responsibility of Julianne. Both Dawn’s mother and grandmother testified at the trial.
On June 18, 1986,[3] Robbie picked up Julianne for his visitation, at 10:00 a.m. Dawn's grandmother got Julianne ready and gave her to Robbie. She exchanged normal pleasantries with him. She also said she assumed he would return the baby (then seventeen months old) at 4:00 p.m. He agreed that he would.
When Robbie did not appear with Julianne by 4:00 p.m., Dawn was concerned. At 6:00 p.m. she and her mother went to the police and reported their concern. They went to Robbie’s house in Cocoa Beach. He lived with his parents. Robbie’s sister, Carol Baker, answered the door and told them Robbie and Julianne were not there. At 10:00 p.m., Dawn and her mother went to Carol Baker’s house. Robbie and Julianne were not there. They drove around the city and beach area looking for Robbie’s car until 4:00 a.m.
The following day, Dawn and her mother reported Julianne missing at the police station. Information concerning Julianne and Robbie went out on the police teletype. They also rented a car and drove to Georgia where Robbie had relatives. The relatives refused to give them any information. They also telephoned Robbie’s uncle in Jacksonville. He told them Robbie and Julianne had just left Jacksonville, but he did not know where they were going. After a fruitless three to five day search in Georgia, they returned home.
For six weeks Dawn and her family had no word or contact regarding Julianne. They never ceased to look for her. They contacted the Florida Department of Law Enforcement, the Bureau of Missing Children in Washington D.C., the Adam Walsh Center, and Find Me, an agency in Georgia. Finally on July 28th, they received a phone call that Robbie was returning with Julianne.
However, Robbie did not give up Julianne willingly. He was brought before a judge on civil contempt charges. He admitted he had violated the court’s custody orders, and the judge ordered him placed in jail until he returned the child to Dawn. Thereafter, with police assistance and with much antagonism on Robbie’s family’s part, Julianne was returned to Dawn’s custody.
Robbie testified that he made a spur-of-the moment decision to take Julianne with him on a vacation with his parents. His father was in Georgia visiting a sick brother and Robbie’s mother went up to join him. Robbie and Julianne drove to Jacksonville and stayed with another uncle. In a day or two they were joined by Robbie’s parents.
Thereafter, for the six-week period the four traveled from motel to motel, park to park, around central and north Florida. They all stayed in one room, and Robbie’s father registered in each place in his own name. Robbie did not use a false name or identification for himself or Julianne. On his travels he often showed her off to strangers and told them she was his daughter.
Robbie testified that he made two attempts to telephone Dawn during the six-week time, but that her grandmother hung-up on him and refused to let him speak to *1262 her. Dawn and her mother testified they did not receive any telephone call from Robbie or his family. The jury is the proper vehicle to resolve that conflict, and they resolved it against Robbie; or, they may have thought Robbie’s efforts were de minimis if believable. Admittedly, he did not make an effort to communicate with Dawn or her family in writing.
Robbie’s odyssey across the state of Florida with Julianne, under the circumstances established in this record, creates a prima facie violation of child concealment (section 787.04(1)). “Concealment” must mean, under this statute, concealing a child from a person entitled to its custody — not concealing it from motel guests, friends and relatives. Further, the intent to conceal need not be proved directly by the defendant’s own admission or statements.[4] Certainly Robbie’s course of conduct over the six-week period supplied the jury with inferences as to his actual intent, if that is required by section 787.04(1).
With regard to the merits of section 787.-04(1), the legislature made a decision that interference with a person’s custody rights is a serious matter which should be addressed by the criminal law.[5] Problems with parents and surrogate parents snatching children from one another have escalated to such a degree that this has been recognized on a national level as a concern and a disgrace. The old standby contempt-of-court remedies have proven inadequate. Such laws as the Federal Parental Kidnapping Prevention Act (FPKPA) — 28 U.S.C. § 1738A (Supp.1988), 18 U.S.C. § 1073 (Supp.1988), 42 U.S.C. §§ 653, 663 (Supp. 1988), and the Uniform Child Custody Jurisdiction Act (UCCJA), § 61.1302 — 61.1348, Florida Statutes, have been enacted by Congress and all fifty states and all territories to thwart such behavior. The Florida legislature has decided that we need section 787.04(1). In a proper case, it must be upheld.
AFFIRMED.
DAUKSCH, ORFINGER, COBB, COWART, DANIEL and GOSHORN, JJ., concur.

. The constitutionality of section 787.04(1) is not raised in this case.

. That offense is described as:
787.03 Interference with custody.—
(1) Whoever, without lawful authority, knowingly or recklessly takes or entices any child 17 years of age or under or any incom-. petent person from the custody of his parent, guardian, or other lawful custodian commits the offense of interference with custody and shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
(2) It is a defense that:
(a) The defendant reasonably believes that his action was necessary to preserve the child or the incompetent person from danger to his welfare.
(b) The child or incompetent person was taken away at his own instigation without enticement and without purpose to commit a criminal offense with or against the child or incompetent person.
(3)Proof that a child was 17 years of age or under creates the presumption that the defendant knew the child's age or acted in reckless disregard thereof.

. This was twelve days short of Robbie’s 19th birthday.

. 14 FlaJur.2d Criminal law § 41 at 107 (1979). See State v. Medlin, 273 So.2d 394 (Fla.1973); Simmons v. State, 151 Fla. 778, 10 So.2d 436 (1942); LaRussa v. State, 142 Fla. 504, 196 So. 302 (1940).

. It appears this statute was initially passed with reference to custody problems concerning children taken across state lines. See 5 Miami L.Q. 312(1951); 12 U. Miami L.Rev. 428 (1958). As noted in 60 Fla. B J. No. 3, How to Recover a Missing Child after a Parental Kidnap at 57 (March 1986), Florida has made criminal two types of conduct involving custody under section 787.03 (prohibits taking a minor child from the custody of his parent), and section 787.04.