575 So.2d 744 (1991)
Mary Anne SANCHEZ, Appellant,
v.
Jorge SANCHEZ, Appellee.
No. 89-2192.
District Court of Appeal of Florida, Fifth District.
February 28, 1991.
Joseph H. Forbes, Gainesville, for appellant.
Richard S. Fitzpatrick, of Fitzpatrick & Fitzpatrick, P.A., Inverness, for appellee.
W. SHARP, Judge.
Mary Anne Sanchez, the former wife, appeals from a judgment which modified the parties' judgment of dissolution by transferring primary residential custody of the parties' two minor children from herself to Jorge Sanchez, her former husband. Because we find insufficient evidence in the record to warrant the change in primary custody, we reverse.
A party seeking to change a judgment which determines custody of a minor child must show a substantial change in the condition of one or more of the parties has occurred and that the best interests of the child will be promoted by the change. Adams v. Adams, 385 So.2d 688 (Fla. 3d DCA 1980); Stricklin v. Stricklin, 383 So.2d 1183 (Fla. 5th DCA 1980). The party seeking the change must present strong, competent testimony or evidence to support those legal conclusions. Zediker v. Zediker, 444 So.2d 1034 (Fla. 1st DCA 1984).
*745 The record (read most favorably to support the trial court's findings) shows the parties were divorced in August of 1988, and primary custody of two children, then ages three and four and one-half, was given to Mary Anne. All the testimony tended to show these young children were thriving and well-adjusted in Mary Anne's care. They were bright, happy, and were learning math and reading well in advance of their age groups under Mary Anne's tutelage. Both were still strongly bonded to their mother, who had been their primary care-giver since their birth. Even the trial judge agreed the children's stronger ties were with their mother, and he recognized the change in primary custody was going to cause "an emotional upheaval in their children's lives."
The primary reason for a change of circumstances proffered by Jorge and relied upon by the trial judge had its origin in Mary Anne's relationships with two men after the divorce. The first was a two to three week "affair" in October of 1988. Mary Anne had known this individual sixteen years earlier. He had no contact with the children.
The second individual, one Hafner, was a longer-lasting, more serious relationship, continuing for five months. Mary Anne and the children shared meals and other activities with him. He did spend the night at Mary Anne's house perhaps as often as twenty times. Mary Anne testified the children were never present when the two had sexual relations. Hafner testified that occasionally the two children came into Mary Anne's bedroom in the morning.
Mary Anne and Hafner went on a trip to London for one week. She discovered she was pregnant with his child. Mary Anne refused Hafner's proposal of marriage and decided to have the baby on her own. Hafner was obviously upset at her decision.
At the time of the modification hearing, Mary Anne had ended (some six months earlier) her relationship with Hafner and intended to minimize Hafner's contact with their unborn child. She testified she had not understood that having a man with whom she was involved spend the night at her home might harm her children, until the psychologist explained it to her. She also testified she realized she had made a mistake with Hafner, and she did not intend to ever get into a similar relationship or situation.
The trial court made the following findings as required by section 61.13(3), Florida Statutes (1989):
(a) the mother's testimony that she wants minimal contact with the father of the unborn child shows the mother fails to understand the need for children to have frequent and continuing contact with both parents.
(b) both children have bonded to both parents, and although there will be upheaval if the children are moved, the change is better for them in long run.
(c) the testimony that the mother went abroad with Hafner after being warned about excessive job absences, shows that the mother did not appreciate the need to keep a stable job to provide for the needs of the children.
(d) the environment is unsatisfactory in the mother's home and it is undesirable to maintain that environment.
(e) the family unit is about to change with the birth of the illegitimate baby which the mother intends to raise fatherless.
(f) the mother has a complete lack of moral fitness shown by her sleeping with men and the children's knowledge thereof.
(g) the mother lacks proper mental health as shown by her sexual promiscuity and her lack of concern regarding her job and the unborn child's relationship with its father.
(h) community record is adverse to the mother as shown by her failure to continue the children's church attendance.
(i) the children are too young for the trial court to consider their preferences.
(j) the boys' failure to reveal to the psychologist who testified in this case that Hafner slept with the mother indicates the children were aware and ashamed of their mother's actions and also that the boys need some religion.
*746 The first finding by the trial court related to Mary Anne's and Hafner's unborn child. It had nothing to do with the two children involved in this proceeding. There was no testimony whatsoever that Mary Anne had limited or hindered in any way Jorge's visitation and contact with their two children. In fact, the opposite is true. Mary Anne testified she encouraged Jorge's involvement in the children's lives and activities above and beyond his visitation rights. Jorge did not controvert her testimony.
The second finding is only half right. The psychologist testified the children had bonded well to both Jorge and Mary Anne and that they were emotionally healthy and stable. But even the judge realized that the far stronger ties of these two very young children were to their mother.
The third finding is without any basis in the record. Mary Anne's supervisor testified that Mary Anne's trip to London was not the reason she was suspended from her job as a nurse in the critical care unit of Citrus Memorial Hospital. The cause for her suspension related entirely to her need to take off more time than was allowed to care for the children when they became ill. The supervisor also testified that Mary Anne's job was not in jeopardy.
The next finding pertains to the fact that Mary Anne was about to give birth to a baby out of wedlock. Unless it was clearly shown that the two children would be adversely affected by the birth of the illegitimate child, this circumstance should not be the basis for change of custody. In fact, the only testimony offered on this point came from the psychologist who said that the two children were pleased and delighted with the prospect of having a new sibling in their home. They were totally unaware of any shame or stigma which might attach to the baby's illegitimacy.
The next two findings repeat some of the prior ones, but they essentially conclude that Mary Anne is sexually promiscuous and morally unfit. This is based on her two relationships with the two individuals shortly following her divorce. Given contemporary standards of behavior, we do not think such conclusions are justified, although we do not condone her actions. Further, Mary Anne admitted fault and said she would never repeat that pattern of behavior.
The court also faulted Mary Anne because she failed to "continue" the children's church attendance. However, the record showed, without dispute, that when Jorge and Mary Anne were married, they rarely attended the Catholic church to which they belonged. Mary Anne explained that the children were just babies, and they cried, often upsetting the congregation. She testified she had recently become interested in a nearby Baptist church and planned to involve the children there. We cannot agree that this testimony establishes any change of circumstances. Further, we question whether the courts should require parents to take their children to any organized religion or stand to risk losing primary custody.
With regard to the trial judge's last finding that the children were ashamed of their mother, or that they knew or understood anything about sex or sexual misconduct, there is no basis in this record to support it. The psychologist testified "to suggest Mary Anne was a poor moral influence on the children goes way beyond the data." He said he found no symptoms or indication the children had suffered any adverse effects from Mary Anne's relationship with Hafner or her pregnancy.
Accordingly we reverse the judgment appealed and remand for further proceedings.
REVERSED and REMANDED.
DAUKSCH, J., concurs.
GOSHORN, J., dissents without opinion.