700 So.2d 752 (1997)
Mahmoud Ismail AYYASH, Appellant,
v.
Mona Lehman AYYASH, Appellee.
No. 96-3374.
District Court of Appeal of Florida, Fifth District.
October 10, 1997.
Patricia L. Strowbridge of Patricia L. Strowbridge, P.A., Orlando, for Appellant.
Joy M Goff-Marcil of Goff & Goff-Marcil, Orlando, for Appellee.

EN BANC
HARRIS, Judge.
The issue in this case is whether the trial court erred when it amended a temporary *753 order entered pursuant to section 61.13(2)(a), Florida Statutes, which had granted custody to the father after the mother had absconded with the children. The amended order gave custody to the mother on her application after she was located in Tennessee and ultimately brought before a Florida court. We find error and reverse.
The mother fled the state and concealed the children for some six and a half years. After she was found, she petitioned the court to modify the temporary custody previously awarded the father. The court granted her request and the father appeals, contending that he was the victim of a double standard (because he is the father rather than the mother) and was subjected to racial stereotyping.
Mahmoud Ayyash (Mike), an American citizen since 1972[1] but of Palestinian origin, and Mona Ayyash were married in 1987 and lived in Orlando, Florida. They are the parents of two daughters. Shortly before the birth of the second daughter, Mona moved out of the marital home and into the home of her parents, who also lived in Orlando. She filed for divorce, seeking sole custody of the children. After Mike responded to the complaint, Mona took a voluntary dismissal. Mike filed a separate action for dissolution and sought custody of the children. Mona, with the assistance of her parents, fled the state, fraudulently obtained a false birth certificate and a driver's license in the name of a deceased woman, and successfully concealed the children from their father for over six years.
In 1991, the Orange County Circuit Court granted temporary custody to Mike. This was done under the authority of section 61.13(2)(a), Florida Statutes, which grants the court jurisdiction to determine custody, even if the child is not before the court, if it finds that the child was removed from the state in order to avoid a determination of custody. In June, 1992, an Orange County circuit judge entered an order to take the children into custody. The children were finally located in Tennessee in 1996. The mother first presented her request for a change of custody to the Tennessee court, which declined to assume jurisdiction of the matter, finding as one of its reasons: "[T]his Court further would decline to exercise jurisdiction based upon 36-6-209 [Tenn.Code Ann.] in that I believe that the conduct of Ms. Ayyash was as defined, reprehensible conduct, because she knew after May of 1991, that there was a Court Order from Florida and she chose to ignore it. Furthermore, she was also aware at this time that the courts in Florida had granted her husband custody of the children and she took no action to modify this action of a Florida Court by having counsel file a Petition for Modification in the State of Florida."
It was the mother's position below that she fled the state and concealed the children because she feared the father would flee with them to Jordan where she could have little contact with them. Although Mona testified below that she feared that Mike would take the children and flee the country, the trial court not only found that this testimony was incredible, but also seemed to question even that Mona had such fear. The court below found:
There is no basis that the court can find no substantial basis that the father would think about leaving the country. The mother may or may not have had this strong concern about that occurring when she left in the past. In any event, she's shown to be wrong, if you did have the opinion, because it'sat this time it's not shown to be the case. The father's found to be a very responsible person and has ties with the community and there's no legitimate reasonable basis to fear that he would be leaving the country with the children. (Emphasis added).
What then was the court's basis for finding that custody should be modified? There appear to be only two reasons. First, because the mother has had the children for the last six years, stability would be maintained by modifying custody. Although the courts often rely on continuing a stable environment in determining who should be the primary *754 residential parent, we have not been referred to any case holding that this "stable environment" can be created by absconding with the children. Such a policy would be in conflict with the state's objective of encouraging shared parental responsibility. The very first criterion for the courts to consider in determining the best interest of the child is which parent is more likely to allow frequent and continuing contact with the nonresidential parent. Since Ms. Ayyash flunked this test so badly, the other criteria pale in significance.
The other reason stated by the trial court is that the mother should be given the opportunity to redeem herself. She should be able to prove that in the future she will be a responsible parent and permit the father to participate in the lives of his children. While redemption is always a noble objective, it is not a basis for modifying custody. Nor does this reason appear to be totally neutral since it seems to be preparing the mother for permanent custody.
Neither of these reasons justify ignoring an existing custody order entered by a different circuit judge while the mother was on the run with the children. Although the judge whose order is on appeal was concerned with the best interests of the children, he appears to have deferred consideration of that issue. He stated:
But what's going to be in their best interest is for the parents to now recognize each other as parents and to respect each other as parents and toregardless of which one ultimately gets primary residential care of the children, to be willing to support the other parent in their contact with the children.
Even if we assume that the court found that it was in the best interest of the children to remain with their mother, and entered its judgment accordingly, still its decision must be supported by the record.[2] Let's examine the record to see if the judge's decision that the best interest of the children would be served by awarding custody to the mother is supported by the record.
The legislature, has provided: "After considering all relevant facts, the father of the child shall be given the same consideration as the mother in determining the primary residence of a child irrespective of the age or sex of the child." Section 61.13(2)(b) 1, Florida Statutes. This is a gender-neutral policy in awarding child custody. This policy, however, is perhaps distinguished more by its lack of general judicial acceptance than by its routine application in custody cases.[3] If a *755 court is really serious in applying a gender-neutral custody policy, it will set down the pluses and minuses of each parent and then evaluate the custody issue based only on the resulting scoresheet.[4]
First, let's consider the record as it relates to the father's side of the ledger. In this case, we have a father who has maintained stable employment and has resided in the same home for over ten years. Indeed, the court found him to be "a very responsible person" who "has ties with the community." The mother, on the other hand, has moved over twelve times and to several different states in that same time span and has depended, on many occasions, for support from her parents. (See section 61.13(3)(e)). We have a father who has shown respect for the law by attempting to obtain custody through legal channels (not reverse kidnapping) and a mother, on the other hand, who absconded with the children and improperly denied the father any knowledge of their location or their condition. (See section 61.13(3)(j)). We have a father who, so far as this record demonstrates, has been truthful and trustworthy and a mother, on the other hand, who has lied in official documents by obtaining a false birth certificate in the name of a deceased woman and then obtaining a false driver's license in the same name. In these instances, false oaths were almost certainly required. (See section 61.13(3)(f)). We have a father who has by his actions taught the children to pursue their goals in an honest and proper manner and a mother who, on the other hand, has by her action taught the children to seek their goals by lying and deceiving. (Again, see section 61.13(3)(f)). We have a father who, at least in so far as we can determine from this record, is willing to promote and encourage visitation with the other parent and a mother who, as this record clearly demonstrates, not only hid the children from the father for over six years but at the present time professes to believe that the children would be better off with the father out of their lives. (See section 61.13(3)(a)).
Now let's look at what the record establishes on the mother's side of the ledger. We have a mother who has had sole custody of the children for over six years without the help of any moral or financial support from the father. (See section 61.13(3)(b), (c) and (d)). It appears, however, that any advantage to the mother's scoresheet that might normally flow from these factors must be discounted by the fact that they are based on the mother's absconding with the children and hiding them so that the father was unable to provide moral and financial support for the children or to develop a close, loving relationship with them. It seems to be *756 urged that on the mother's side of the ledger should also be the fact that the father is foreign born and the mother is not, that the father is a devout Muslim and the mother is not, and that the father wants his children exposed to both his religion and his heritage while the mother wants their exposure limited to her background. The trial court ignored these "factors" and so shall we.
How does this record support custody with the mother? The father deserves better justification for the ruling, rather than an exhortation that he must be understanding and forgiving of the mother's actions.
The record simply does not support the judge's implied finding that at the time he changed the temporary order of custody the mother would "recognize" and "respect" the father's parental role or that she would "support the [father] in [his] contact with the children." Indeed, she testified at the change of custody hearing that she still believed that the children would be better off without any contact with the father. Under this record, we find no support for a finding that the best interest of the children would be served by returning them to the custody of the one who abducted them, kept them from their father for over six years, and still professes that she thinks the father should be removed from their world. The only lesson the mother has taught the children for the past six years is how to run and hide and pretend to be someone and something they are not. It was an abuse of discretion to remove custody from the father, custody properly awarded during the mother's flight, merely in the hope that the mother will do better in the future. This is particularly true when no believable evidence was offered to reflect adversely on the father's ability to care for the children or his willingness to encourage a continuing relationship between the children and their mother.
But there is another contention made in support of the mother. We are urged to assume that the trial court believed, and relied on as a basis for its ruling, the testimony that the father was abusive to the mother, even though there is no indication in the record that the trial judge believed the testimony or made his ruling based on it. It is logical to assume that a judge who makes a ruling based on a particular legal theory believes the evidence offered in support of that theory. But it is illogical to assume that a judge who makes a ruling based on one theory of law believes the evidence offered in support of another proffered theory which is rejected by him, merely because the result of the action favors the one offering the rejected theory. In other words, it is urged here that since the mother testified that the father abused her, this would support her award of custody even though there is no indication in the record that the judge gave any credence to her testimony.[5] The father's testimony denied that any abuse took place. Indeed, the fact that the mother never reported the abuse even to her own parents (so far as this record indicates) and did not mention it in her original divorce petition even though she sought sole custody, and the additional fact that she raises it now only after she has been discovered and hauled into court and the further fact that she has not been faithful to the truth in the past, place considerable doubt on the truth of her testimony. So much so that the judge in this case, although offered the opportunity to expressly rely on the father's alleged abuse as a basis for awarding custody to the mother, chose not to do so.
Then there is the contention that there was testimony that the father, a Muslim, stated that he desires that his children be raised in a "real society with a real religion" *757 and wanted his children exposed to "his traditions and his heritage." It is also urged that there was testimony that Palestinian men considered their wives and children to be possessions. Search as one may, one finds no indication that the judge based his decision to grant the mother custody on any theory that involves this testimony. Indeed, for the trial judge to prefer one religion over another in deciding custodyin a society as diverse as ourswould be most inappropriate. And to suggest that it is a bad thing to expose the children to the traditions and the heritage of either parent is insupportable by this record.
We recognize the present problem created by the mother's intolerable conduct. She has made the father a stranger to his children. She has robbed the father and the children of some six and a half years of paternal contact which almost every authority considers important to a child's development. How can the father now be best introduced into the lives of his children? It is a difficult question, but to return the children to Tennessee in the custody of a mother who testified below that she still believes that it is in the children's best interest to grow up not knowing their father is an abuse of discretion.
We must also consider the precedent which we would set if we approved the trial court's order. It tells all parents litigating custody, assuming gender plays no role in the court's forgiveness of one absconding with the children, that a parent can flee with the children and conceal their whereabouts from the other parent, even knowing the other parent has a court order granting him or her custody, and suffer no ill consequences if caught. In Costlow v. State, 543 So.2d 1259 (Fla. 5th DCA 1989), this court upheld the conviction of a father who merely avoided his responsibility under a custody order to return the child after visitation to the mother for six weeks. The father moved from motel to motel in Florida but always used his own name. He was found guilty of violating the criminal provisions of section 787.03, Florida Statutes, which prohibits the concealment of a child from the custodial parent if one knows of the order granting custody. The mother in this case acknowledges that she was aware of the father's custody order and was aware that he was trying to locate her. The trial court acknowledged:
What's occurred, as counsel for theas Ms. Strowbridge has said, there has been a significantit's not being labeled a crime at this point by society in that the mother is not being charged with a felony, I think she's lucky at that pointat this point that a case could have been brought, but I also think that it's better if it's not being brought at this point.
There is no justification, absent a specific finding of best interest of the children properly justified by the record, to ignore the temporary order of custody previously obtained by the father. If we are to accord any validity to an order entered when a parent has absconded, even if the order is temporary and is entered in the absence of the absconding parent, more must be required in order to change custody than was presented in this case.
The children should be delivered to their father. Because of the adjustment required by the long separation, the court might order counseling and may wish to appoint a guardian for the children to monitor the children's adjustment to living with the father. If this adjustment proves detrimental to the children, then further action may be required.
REVERSED for further action consistent with this opinion.
DAUKSCH and THOMPSON, JJ., concur.
ANTOON, J., concurs specially with opinion in which DAUKSCH and COBB, JJ., concur.
GRIFFIN, C.J., dissents, with opinion in which W. SHARP and GOSHORN, JJ., concur.
W. SHARP, J., dissents with opinion in which GRIFFIN, C.J., and GOSHORN and PETERSON, JJ., concur.
ANTOON, Judge, concurring specially, with opinion.
I concur with the result reached by the majority that the children must be placed in *758 the custody of their father based on the evidence contained in the record, as well as the policy reasons set forth in Judge Harris' opinion.
I agree with Judge Sharp that the trial court was not constrained by the requirement that there be a showing of a substantial change of circumstances in order to modify the temporary custody order. The temporary order was not incorporated into the final judgment dissolving the parties' marriage, and therefore, the doctrine of res judicata did not apply.
I further agree that a violation of a temporary custody order does not ipso facto deprive the violating parent of custody without a consideration of what is in the best interests of the children. The dissent maintains that the trial court properly considered the evidence regarding custody without regard to the earlier order awarding temporary custody to the father. However, under the facts of this case, the result urged by the dissent would be extremely detrimental to the integrity and dignity of proceedings before Florida family courts. In this regard, a ruling from this court allowing the children to remain in the custody of their mother would validate the shocking advice that the mother claims to have received from a member of the Florida Bar, to "let sleeping dogs lie," continue secreting the children from their father, and ignore the temporary custody order. Such a ruling would indeed spring Pandora's box wide open. Under the dissent's view, once a noncustodial parent is caught after having successfully avoided the frantic efforts of the custodial parent to locate his children by legal means over a protracted period of time, the remedy would be a de novo trial of the custody issue. At this de novo trial, the noncustodial parent, who had illegally absconded with the children, would nonetheless have an advantage because the absconding parent would have established a favorable status quo.
Here, the trial court did not have the benefit of any guidance from the legislature or the appellate courts as to what the absconding parent's burden of proof is in a case such as this where the children have been completely deprived of contact with their custodial parent for over six years. The "best interests of the children" test should never be abandoned in the placement of children. However, the playing field must be level in order to make that determination. Perhaps the parent who violated the custody order should be required to affirmatively show that a return of the children to the parent with temporary custody would likely result in physical or emotional harm to the children. If so, the trial court should be required to make findings of fact in this regard. Another possibility would be to create a rebuttable presumption that placement with the legal custodian would be in the best interests of the children. The absconding parent would then have the burden of overcoming the presumption. Again, the trial court should be required to make specific findings of fact.
In any event, it is my view that the record evidence concerning the impact that the mother's conduct has had on the children is compelling. The trial court received uncontradicted expert testimony that the children suffered posttraumatic stress syndrome as a result of their mother's conduct. There was also expert testimony that it was in the best interests of the children's mental health to be returned to their father because, if returned to the mother's custody, the children would be concerned about the possibility of another abduction. The record evidence indicates that the possibility of another abduction was a valid concern. In this regard, the mother, upon being apprehended in November, lamented that she had stayed in one place too long and had planned on moving again after the holidays. Experienced law enforcement officers, who were instrumental in locating the children, testified before the trial court that the mother was indeed a flight risk if the children were returned to her. Unfortunately, neither the trial court nor the dissent has mentioned this evidence.
Under the facts of this case, I agree that reversal is required.
DAUKSCH and COBB, JJ., concur.
GRIFFIN, Chief Judge, dissenting.
The lower court, in this case, was presented with a very difficult issue to decide. Keep *759 in mind that the issue was where to put these two children, aged seven and eight, immediately and temporarily. After patiently taking plenty of time to hear all the testimony offered by both parties, the trial judge reached the decision to allow the children to be with their mother. Tempting as it might have been to punish the mother for her conduct, it appears to me from reading the record that the court was assiduous in resisting this temptation and in focusing on the best interests of the children. The fact that the majority of the judges on this court would have weighed the evidence differently should not matter.
The majority opinions, as they must be, are ultimately premised on the notion that there is no competent substantial evidence in the record that it would be in the best interest of these two children to be placed temporarily with their mother rather than to be placed with their father. This conclusion is reached by violating the most basic rule of an appellate courtwholesale reweighing of the evidence. Noonan v. Snipes, 569 So.2d 1381 (Fla. 2d DCA 1990); Crain & Crouse, Inc. v. Palm Bay Towers Corp., 326 So.2d 182 (Fla. 1976); Clegg v. Chipola Aviation, Inc., 458 So.2d 1186 (Fla. 1st DCA 1984). The fact that this is accomplished by placing facts on different sides of a ledger sheet rather than two sides of a scale does not disguise what is occurring. It is ironic that the majority (as it must) clings fervently to the very same judge's finding that Mr. Ayyash would not have taken the children to live in Jordan. (Note that the trial judge did not find that Ayyash never threatened to take the girls to live in Jordan or that Mrs. Ayyash did not reasonably believe his threats to take them to Jordan.) The court simply observed that the passage of six and one-half years since the mother left with the children demonstrated his intention to remain in the United States. This is the same judge who cannot be trusted with a ledger sheet; the same judge whose hearing of the testimony and whose observation of the demeanor of the parties and witnesses is evidently deserving of no deference. The judge who was wise to conclude that Mr. Ayyash could be trusted to keep the children in the United States is the same judge who could not figure out that he was not permitted to weigh the actual life circumstances of these two girls did not understand that he could not consider their relationship with the mother or their life for the previous three and one-half years in the same small town in Tennessee. Nor could he consider that the oldest child was only a year old when the parents separated and that the younger child had not been born. He could not consider the cultural differences and the living circumstances of Mr. Ayyash, a self-described traditional Muslim and his new Palestinian wife, who was raised in Jordan, who had lived only two and one-half years in the United States, speaks only limited English, and was already coping with a three and one-half year old daughter and a newborn son, all living in a two-bedroom house.[1]
The lower court cannot be reversed on the basis of some perceived inadequacy in his comments made to the parties in exhorting them to do what is best for their children. Given the trial court's core findings that neither parent would abscond with the children and that it was in the children's best interest to remain with their mother, the majority's notion that no competent evidence can be found in this record that the best interests of these two children could be served by allowing them to remain with their mother on a temporary basis is somewhere beyond contumacy. Appellate courts ought never to go there and, when they do, they should be put right by those to whom they answer. Since there is very little Florida law on the proper role of an appellate court with which the majority and concurring opinions do not conflict, it is hoped that the supreme court will look closely at the majority.
W. SHARP and GOSHORN, JJ., concur.
*760 W. SHARP, Judge, dissenting.
I respectfully dissent. In my view, the temporary custody order which is being appealed by Mahmoud Ismail Ayyash (Michael), the former husband and father, should be affirmed. The trial court thought it was in the best interests of the two young children, Sara, age eight, and Camille, age six, that they be placed temporarily in the custody of their mother, Mona Lehman Ayyash, and the record supports that determination.
The trial court should be allowed to make a later, more informed decision concerning the permanent residential custody of these two young children, as it intended to do, based on additional testimony, home studies, psychological evaluations, reports of guardians ad litem (if necessary), the children's behavior over time, and frankly, the two parents' behaviors in carrying out the temporary custody and visitation orders of the court. This is an imperfect world, and the parents in this case were imperfect. We should not be issuing an opinion that is based on the appellate court's secondhand reading of the transcript and its own interpretation of the disputed facts; and one that ties the hands of the trial judge in trying to work out a custody arrangement that does the least damage to the children.

I. Procedural Posture of this Case
The parties separated in 1989, before the their second daughter was born. Mona lived for almost a year in her parents' home, near Michael's home. Mona had grave concerns that Michael would flee with the children to the Middle East, as he had threatened to do. She filed a suit for divorce in June of 1990. Mona tried to work out a settlement agreement with Michael, which provided that she would have custody, he would have supervised visitation and she would not seek any support. This settlement effort failed.
At the end of June 1990, when Mona was unable to get Michael to agree to supervised visitation with Camille, a newborn, and Sara, age two, and when she was advised by her attorney that no Florida court would order such a visitation arrangement, she left Florida with the two babies intending not to return. She instructed her attorney to dismiss her divorce suit. For the next six years she hid herself and the children from Michael. As the trial judge said at the hearing, she may or may not have had good reasons for her fears that Michael would abscond with the children to the Middle East and she would never see them again. In any event, her actions were wrong, and she acknowledged that fact repeatedly throughout the hearings before Judge Gridley in Florida.
In August 1990, Michael filed for a divorce from Mona and obtained a dissolution decree in 1991. She was never served with process, since he did not know her location. In May of 1991, Judge Russell in Orlando entered an order at Michael's request granting him temporary custody of the children, based on a finding that Mona had absconded with the children and their whereabouts were unknown. However, the judge reserved jurisdiction to determine custody issues since that hearing, which produced the temporary custody order, was ex parte and no substantive testimony concerning the best interests of the children was presented. Although Mona was never served with process in that case, she learned of the temporary custody order from family members after she and the children left Florida. Mona's family consulted a local Florida attorney who advised them to ignore the temporary custody order, and to tell Mona not to return to Florida.
In November of 1996, Michael located the children in Bristol, Tennessee. Police officers and social workers picked them up at their school and took them into the State of Tennessee's custody. Mona sought a hearing before a judge in Tennessee. Even though Tennessee had been the children's home for the past three years, the Tennessee judge declined to exercise jurisdiction because there was an outstanding Florida temporary custody order, Mona had known of it, and she had ignored it.
However, the Tennessee court did not opt to give immediate custody of the two children to Michael. At that hearing Mona presented her continuing fears that Michael would take the children and flee to the Middle East. At the end of that hearing the Tennessee court said:

*761 In any event, I think further that Ms. Ayyash has good concerns about the matters of custody as she presented it today, and that they should be presented, if she so desires, to the proper court in the State of Florida. The decision of this Court is not a final determination of custody as all custody is temporary custody. And that always there are circumstances which can change that custody from one party to another. But I think the appropriate Court to make that decision is not this Court but the Court in Florida.
The Tennessee court ruled that the children should be delivered to Judge Gridley in Orlando, Florida to make any decisions regarding temporary custody. The Tennessee judge said he normally would have required Michael to turn over his passport, but Michael did not have it with him. The Tennessee judge said he would call Judge Gridley and tell him of his concerns regarding custody, and why he rendered his turn-over order in the fashion that he did. He noted that Mr. Weddington, who had been appointed Guardian Ad Litem in the Tennessee proceeding for the children, had expressed concerns about giving the father temporary custody. "And I think primarily that was the reason I decided to make the decision I did about returning the children in that manner is based on what the Guardian Ad Litem said."
Mona filed an emergency petition in Florida to modify the May 1991 order granting Michael temporary custody of the children. She alleged Michael had on many occasions threatened to take the children to the Middle East to be raised there, and that he has substantial family and business connections with that area of the world; that the children, now age six and eight, have no memory of him, although they knew about him and had been using his last name as theirs; that Michael had been physically and mentally abusive during their marriage; the children are happy and thriving in Tennessee, and it would be terribly disruptive to abruptly take them from the only home they had ever known.
Faced with the responsibility of determining what to do with Sara and Camille, who had been delivered to his courtroom under these extraordinary circumstances, Judge Gridley held two lengthy hearings November 25th and December 3rd of 1996. They lasted many hours, and the judge heard extensive testimony from numerous witnesses. He said at the outset, (and I think he got it exactly right), his job was to decide what custody arrangement was in the best interests of the children, and in order to do that "the court really needs to have some factual basis behind the background of both parties to determine what would be in the best interest of the children on a temporary basis."
Initially the court granted Michael temporary custody, with visitation for Mona, for approximately one week, with the understanding that there would be a subsequent hearing on December 3rd. After that hearing, he entered this order which Michael appeals. It grants temporary custody of the children to Mona, and permits her to take them back to Tennessee, to their friends and school in Bristol. Further it provides that Michael will have visitation in Florida with them for the two weeks at Christmas time. It reserves jurisdiction to make further orders concerning visitation, if the parties could not agree on a schedule, and it reserves jurisdiction to make a permanent custody award in the future.
At the close of the last hearing, the court stressed that it was only ruling on temporary matters concerning the children, and that a permanent ruling concerning their primary residence and other matters surrounding their care would be heard at a later time. The judge said his primary guide in making the decision was the best interests of the children. After hearing extensive testimony from many witnesses and from the parties themselves, the judge satisfied himself that at this time, neither party was going to abscond with the children. It found Mona had not talked their father "down" to the children, and she had shown she would be willing to help develop a close relationship between the father and children, to make up for lost time. He urged that both seek professional help for the children.

*762 II. Appropriate Issues and Standard of Appellate Review
I do not think it was necessary nor required that Mona present a strong "change of circumstances" case. The order she sought to modify was a temporary custody order itself, entered without any testimony or evidence as to the best interests of the children. The cases requiring proof of change of circumstances in a child custody case are those in which a fact finder heard testimony and made a determination, based on the circumstances then existing.[1] Thereafter, those issues are res judicata, and cannot be revisited.[2] That is the primary rationale for the change of circumstances rule in such cases. It does not apply to ex parte orders or to temporary orders.[3]
The primary concern of the courts in resolving child custody matters should always be what is in the best interest of the child.[4] Because a parent has breached a court's order or engaged in wrongful conduct does not ipso facto mean that the parent should be punished by denying him or her custody of a child when to do so would not be in the child's best interest.[5] That unfortunately appears to be the essence of the majority opinion in this case. At one point early in the hearing, the trial judge considered the same possibility but rejected it saying he did not want to be put in the position of "cutting off a nose to spite the face."
What is in a child's best interest is an inherently vague and flexible determination, despite the laundry list of considerations set forth in section 61.13(3). It is based on the trial judge's perception of the parties, a sense of the way things are said as much as what is said, and a determination of credibility.[6] In making such a determination, the trial judge is given broad discretion. It should not be limited by hard and fast rules or factors.
Nor has this court required express findings supporting a determination of what is in a child's best interest so long as substantial evidence in the record exists to sustain that ultimate finding.[7] If such evidence exists in the record, a reversal is warranted only if the trial judge is found to have abused his or her discretion.[8]

III. Substantial Evidence in the Record to Support the Trial Judge's Temporary Custody Order
My review of the record indicates this is a case in which conflicting and disputed testimony was presented to the trial judge concerning the circumstances which caused Mona to take the children and leave the State of Florida, and further abundant evidence was presented to support the trial judge's determination that the children remain in Mona's temporary custody, pending a later decision on permanent custody. An appellate court should not substitute its judgment for the trial court's, under these circumstances. To avoid an appellate substitution of judgment, the appellate court should review the record in a manner designed to *763 uphold, not reverse, the trial court's judgment. Sanchez v. Sanchez, 575 So.2d 744 (Fla. 5th DCA 1991).
Mona's reasons for absconding with the children and hiding from Michael, although not legally justifiable, were not totally groundless. The trial court said, after hearing her explanation, that he understood why she did it, although it was not right. She testified, and other witness corroborated her injuries, that during the marriage while she was pregnant with Camille, and nursing Sara, Michael beat, struck, and choked her. She testified he had a bad and violent temper, and he called her a stupid American, much of the time they were together.
Mona testified, and witnesses corroborated, that Michael repeatedly threatened to take the children to the Middle East where they would be raised as Muslims. Mona thought he had the resources and ability to carry out his threats, because he was born in Palestine, and had family and connections in Jordan. After college, he also had worked in Kuwait and The United Arab Emirates. At first he urged her to go with him to Jordan for a visit, take Sara, and have Camille born there. She became fearful that "visit" meant moving there permanently. She refused to go or let the children go.
Mona had been told, and believed, that it would be impossible for her to get the children back, if they were ever taken to the Middle East, because in those countries, fathers are customarily awarded custody of their children. She did not want her two daughters raised in a culture where women were "chattels" and had few legal rights. When she became convinced that Florida courts would not require supervised visitation for Michael, and Michael refused to agree to that in a settlement proposal, she felt she had no choice but to flee.
Just before she left, his threats became more constant and ominous. One disinterested, non-family witness testified she heard Michael threaten Mona, and he repeated the threats to her: that he wanted his children to be raised in Palestine, in the only true religion; that everyone else was an infidel; and that he would take them with or without Mona's permission. The witness testified she was frightened of Michael, and sincerely believed he intended to carry out his threats. Demonstrating her sincere fear that Michael might carry out his threats, Mona applied for passports for her two very young children and obtained them, prior to leaving Florida, simply to prevent Michael from getting passports for them, and carrying out his threat.
Michael denied he ever struck or hit Mona, or that he ever made such threats. Other witnesses corroborated Mona's testimony. Some questioned his veracity generally, saying he would say whatever appeared to be in his best interest at the time. Michael was shown to have misrepresented various facts not immediately in issue. For example, he did not reveal to the minister who married Mona and himself, that he had a prior wife. The minister testified there had been other occasions where he felt Michael was not trustworthy. In addition, Michael told the judge at the hearing in Tennessee, that he had flown via an airline to that hearing, and intended to fly back. Apparently he drove his own maroon BMW to Tennessee and back to Florida.
For the past three and one-half years, Mona established a home for herself and the children in Bristol, Tennessee. She purchased a business for herself as a cosmetologist, and had become engaged to man who lived in Bristol and who has strong ties there. The children were well adjusted and did well in their kindergarten and elementary school in Bristol. They attend a Christian church school with small classes. It was described as a very good school, with lots of love and encouragement, and good discipline. The children were happy with their home and friends, and were active in their church and other activities.
In Bristol, Mona began using Michael's name, Ayyash, for herself and the children. Mona testified she realized that someday Michael would find them. She told the children about him, showed them pictures of him, and did not speak badly about him. This was evident from the way the children related to Michael, upon meeting him for the first time, and thereafter. The Florida guardian ad litem, Ms. Holmes, testified that there had *764 been no active alienation on the part of the mother, Mona, based on her observations of the children and the father.
Mona also testified that she would do her best to carry out whatever visitation orders the court entered, and to promote a good relationship with Michael. She said that she would not hide the children from Michael again, although she still feared he might take them to the Middle East. Now, they were older, spoke English, and knew their mother and family, so she felt they would have a chance to cope with an abduction to the Middle East, should it occur. The trial court stated it did not think Mona would flee with the children again, and that she was concerned about the welfare of the children and she would put their interests first.
At the time of the hearings before Judge Gridley, Michael held a job as a mechanic with Walt Disney World. He had been so employed for the past six years. He had remarried a woman from Jordan, also Muslim, and they had a three and one-half year old daughter, and an infant son. They were living in a small, two-bedroom house. Both admitted the house was not large enough for two more children. They said they were looking for a larger house, but were unable to state they had taken any concrete steps in that direction.
Michael worked long hours beginning at 2:00 p.m. until 11:00 p.m., five or six days per week. Care of the children would have to be undertaken by his current wife, although she also had a toddler and an infant on her hands. She spoke English, but not fluently. Her culture and background, as a Muslim woman raised in Jordan, were very different from the culture in which Sara and Camille had been raised. Michael testified he would try to change his work hours to the midnight shift, if granted custody of Sara and Camille. At this point, Michael had no concrete plans about how to cope with and raise Sara and Camillewhere they would go to school, how he would further their religious education. He admitted he had no present affiliation with any church.
There was also testimony that the children had been traumatized by being abruptly taken from their mother's care, and delivered to a father they did not know. They were handling it well, but the trial judge noted his concern on that ground. The grandmother testified she observed upset on the part of the children.
The guardian ad litem, Ms. Holmes, interviewed numerous people and made extensive observations, considering the short time in which she had to operate. She testified that it was in the best interests of the children to continue the stable life they knew, while establishing contact with the father and promoting that relationship. They wanted to return with their mother to Tennessee, and to their home, school and friends. She said this was a difficult situation, but she warned against punishing the children for what one grownup did. She said, "I'm concerned about the effect that it would have on these girls if they were removed from the contact and care of their mother, because that is what they have known. And thestability question as far as the relationship the children have with their mother, they have, as I described to you, a close loving relationship."
In my view, the trial court entered a rational order, giving temporary custody to Mona. It wanted to have the custody issues mediated prior to a final hearing. It also wanted to talk with psychologists, to try to determine what was in the children's best interests. It probably also wanted time to see how these parties and the children handled themselves in carrying out the court's visitation orders, as well as what practical living arrangements Michael and his new wife and family could make for Sara and Camille, if he was granted permanent custody. Until the decision on permanent custody was ripe to be made, the temporary order was intended to maintain these young children in as stable a condition as possible, and minimize more upheaval. That is a valid goal for a temporary custody order, which addresses the best interests of the children.[9] Accordingly it should be affirmed. Not to do so creates, in my view, a conflict with the *765 cases cited in footnotes three, four and nine of this opinion, and contravenes the basic premise of appellate law that, where there is substantial, competent evidence which supports a trial court's ruling, after a hearing on the merits, it should not be overturned by an appellate court.
GRIFFIN, C.J., and GOSHORN and PETERSON, JJ., concur.
NOTES
[1] Mike graduated from a Chicago high school and received a degree from Southern Illinois University. He has been employed at Walt Disney World since 1988.
[2] Judge Sharp has written as good an opinion as possible in support of the trial court's custody determination and, by so doing, has pointed out the philosophical differences between the majority and the dissenting positions.

She first emphasizes that the court's order under review is temporary rather than permanent. She does not, however, explain what difference this makes. The "best interest of the child" is the guiding principle in either case and the legislature has established criteria [section 61.13(3)] which the trial court must consider in determining the best interest of the child.
Although the trial judge articulated the reasons for his decision, Judge Sharp bases her opinion on a presumed unannounced reason and opines that "the judge has broad discretion. It should not be limited by hard and fast rules or factors." She also urges that the trial judge should not be required to express the reason for his custody ruling.
But we believe that although the trial judge indeed has broad discretion, he is nevertheless bound to consider the factors set out in section 61.13(3). Although one such factor is: "[a]ny other fact considered by the court to be relevant," this provision does not permit the trial court to keep a "fact" which it considers relevant secret from the parties and the appellate court by not discussing it in the final judgment or, at the very least, in the record. If such blind discretion is permitted, then a party would have no opportunity to challenge the ruling on the basis that the "fact" was not supported by the record. This, in turn, might lead to a perception, or worse the reality, that the custody determination is arbitrary and capricious.
Further, this additional "fact" which the trial court may consider is only one found relevant by the trial court and not by members of this court. The trial judge below told us the reasons he believed relevant to his determination to return the children to the absconding mother and his stated reasons are insufficient.
[3] As noted in Justice Shaw's concurring opinion in Mize v. Mize, 621 So.2d 417 (Fla.1993), the "tender years" doctrine which held "[o]ther things being equal ... the mother of infants of tender years [is] best fitted to bestow the motherly affection, care, companionship, and early training suited to their needs" was long recognized in Florida. Even though this doctrine was overturned by the legislature's gender neutral policy, there remains a temptation for many judges to consider the right to custody as the mother's to lose and unless her fitness is legitimately challenged, the father's right of equal consideration is often ignored.
[4] Judge Griffin disdains the concept of a balance sheet approach. She suggests that it reweighs the evidence. Instead, it suggests that the trial judge did little, if any, weighing in the first place. She, as does Judge Sharp, in suggesting possible reasons for the court's ruling, ignores the fact that the court gave the reasons for its ruling. Neither of them suggest that the reasons given by the court are adequate. Instead they suggest that the judge had other reasons, good reasons, but he merely failed to disclose them to the father or this court. Judge Griffin also complains that while the majority of the judges are willing to accept the court's finding that the father never was a threat to remove the children from Florida, we are unwilling to permit it to weigh "the actual life circumstances." These life circumstances seem to be the children's "relationship with the mother," the fact that the mother had lived in the same town in Tennessee for three years, that she worked there, and that she planned to get married. The problem is that there is no indication that the court weighed these factors against the fact that the mother-child relationship was created by absconding with the children and that the father has lived in the same house for over ten years, has worked at the same job considerably longer than that and is married. The father must wonder if Judge Griffin's factors are so important, if the genders were reversed and it was the father who fled with the children and was found some six years later in a Palestinian enclave in Detroit and hauled back to a Florida court, if the judge would again release the children to him because of his relationship with the children and the fact that he had lived in Detroit for three years, had a job there and intended to get married. But it is Judge Griffin's suggestion that the judge can determine custody by looking at only one side of the ledger that is most troubling. If the judge makes a ruling for reasons not clearly in the record, there will always be a concern that the balance sheet that he is using has only one side.
[5] In response to the suggestion that the law supposes that the judge must have believed the testimony about the spouse abuse even though he rejected spouse abuse as a basis for his ruling, one is reminded of the statement by one of the characters in Charles Dickens' Oliver Twist: "`If the law supposes that,' said Mr. Bumble, squeezing his hat emphatically in both hands, `the law is an assa[n] idiot.'" Mr. Bumble was responding to the equally untenable legal supposition that a man is responsible for the acts of his wife, indeed even more responsible than the wife, because "the law supposes that your wife acts under your direction." A more reasonable supposition, and one with which even Mr. Bumble would agree, is that if the court does not accept a proffered theory, he probably did not believe the evidence offered in support of that theory.
[1] There is an undertone in the briefs and in the majority opinion that even to mention, much less ascribe any significance to certain of these factors is xenophobic, even "racist." For anyone who has experienced first-hand, however, the shock and discomfiture of living with strangers in a different cultural environment and not be able to understand the language being spoken around them is to ignore reality at the expense of political correctness. To conclude, as the lower court apparently did, that these two children would benefit from being introduced to their father and his new family in a more controlled way is not "racist."
[1] See, e.g., Wages v. Wages, 660 So.2d 797 (Fla. 5th DCA 1995); Sanchez v. Sanchez, 575 So.2d 744 (Fla. 5th DCA 1991).
[2] Schweinberg v. Click, 627 So.2d 548 (Fla. 5th DCA 1993).
[3] See Jones v. Jones, 674 So.2d 770 (Fla. 5th DCA 1996); Nicholson v. Nicholson, 671 So.2d 821 (Fla. 1st DCA 1996); Griffith v. Griffith, 627 So.2d 527 (Fla. 2d DCA 1993); Murphy v. Murphy, 621 So.2d 455 (Fla. 4th DCA 1993).
[4] See Duchesneau v. Duchesneau, 692 So.2d 205 (Fla. 5th DCA 1997); Williams v. Williams, 676 So.2d 493 (Fla. 5th DCA 1996); Allan v. Allan, 666 So.2d 170 (Fla. 2d DCA 1996); Dillingham v. Dillingham, 667 So.2d 337 (Fla. 1st DCA 1995); Silvestri v. Silvestri, 309 So.2d 29 (Fla. 3d DCA 1975); Ebaugh v. Ebaugh, 282 So.2d 14 (Fla. 4th DCA 1973).
[5] Callaghan, Contemporary Family Law, Principles, Policy and Practice, Vol. IV, § 39.07; Crippen v. Crippen, 508 So.2d 1339 (Fla. 4th DCA 1987); Andrews v. Andrews, 624 So.2d 391 (Fla. 2d DCA 1993); McKennon v. McKennon, 312 So.2d 804 (Fla. 1st DCA 1975).
[6] Williams v. Williams, 676 So.2d 493 (Fla. 5th DCA 1996).
[7] See Duchesneau v. Duchesneau, 692 So.2d 205 (Fla. 5th DCA 1997). See also Murphy v. Murphy, 621 So.2d 455 (Fla. 4th DCA 1993); Griffith v. Griffith, 627 So.2d 527 (Fla. 2d DCA 1993).
[8] Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980); Silvestri v. Silvestri, 309 So.2d 29 (Fla. 3d DCA 1975); Ebaugh v. Ebaugh, 282 So.2d 14 (Fla. 4th DCA 1973).
[9] See Buckhalt v. McGhee, 632 So.2d 120 (Fla. 1st DCA 1994); Potter v. Haffner, 561 So.2d 1 (Fla. 2d DCA 1990); Palmore v. Sidoti, 472 So.2d 843 (Fla. 2d DCA 1985).